William GRANT and Margaret Grant, Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Defendant.

WESTINGHOUSE ELECTRIC CORPORATION, Third–Party Plaintiff,

v.

ABRAHAM & STRAUS CORP., Third–Party Defendant (Two Cases).

Thomas HART and Margaret Hart, Plaintiff,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Defendant.

Nos. 89–CV–280 (DRH), 89–CV–418 (DRH).

United States District Court, E.D. New York.

Feb. 17, 1995.

Sullivan & Liapakis, P.C., New York City by Abby J. Resnick, for plaintiffs Grant.

Matthew M. Cordrey, New York City, for plaintiff Hart.

Olshan Grundman Frome & Rosenzweig, New York City by Lawrence A. Hoffman, for defendant and third-party plaintiff Westinghouse.

Callahan, Schepp, Yuhas, Adams & Carfora, New York City by Louis Schepp, for third-party defendant Abraham & Straus.

## ORDER

HURLEY, District Judge.

Application by Westinghouse Electric Corporation ("Westinghouse") for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or alternatively, for a new trial, is denied. Moreover, the application of Abraham & Straus Corporation ("A & S"), the third-party defendant, for the same relief, is denied. However, A & S's application for a reduction in the amount awarded by the jury for future medical expenses is granted.

## INTRODUCTION

The plaintiffs Grant and Hart, while in the employ of A & S, sustained injuries from an explosion of an electrical switchboard, manufactured by defendant Westinghouse, which powered the escalators within the store.

The complaint contains causes of action sounding in both negligence and strict tort liability. Plaintiffs maintain Westinghouse was negligent in the manufacture of the product, as well as in failing to provide appropriate warnings concerning dangers associated with the use of the product. Three predicates for liability are embraced within the strict tort liability claims, to wit, defec-

tive manufacture, defective design and failure to provide appropriate warnings.

After a two-week trial, Westinghouse was found liable solely under the plaintiffs' claim of negligent failure to warn. The jury rejected all other theories of liability advanced, including the strict liability claim of failure to warn.

The jury found that the plaintiff William Grant sustained total[1] damages of $504,320, with the corresponding figure for plaintiff Thomas Hart being $33,248. Fault was apportioned as follows: 20% to Westinghouse, 40% to William Grant and 40% to A & S, the latter entity having been found responsible by the jury to the defendant and third-party plaintiff, Westinghouse, for its failure to properly inspect and maintain the subject equipment. Parenthetically, the claims alleged in the complaint on behalf of Margaret Grant and Margaret Hart were discontinued by their respective counsel at the commencement of trial.

After the jury returned its verdict, the Court asked counsel to approach the bench. The sidebar colloquy proceeded as follows:

> THE COURT: Is there any reason I shouldn't discharge the jury? It seems to me they've done the job and I think the verdict sheet does not suffer from inconsistency.
>
> MR. HOFFMAN: Not any that they can resolve.
>
> THE COURT: Agreed?
>
> MR. SCHEPP: Yes.

Immediately following the above colloquy, the jury was discharged. Thereafter, the Court asked if any of the attorneys had any motions. In response, Mr. Hoffman made a motion for a judgment as a matter of law on three grounds:

(1) since the jury found Grant partially at fault, they must have found that he inserted an object into the arc chute. That behavior was unforeseeable by Westinghouse and, accordingly, constituted a superseding cause of the accident;

(2) the jury's finding of a negligent failure to warn, coupled with its conclusion that

Westinghouse was not responsible under a corresponding strict tort liability claim, rendered their verdict inconsistent.

(3) There was no evidence, in any event, to find that Westinghouse was negligent in failing to provide instructions.

Mr. Schepp, on behalf of the third-party defendant A & S, also moved orally immediately following the discharge of the jury for a judgment as a matter of law. The gravamen of his claim was that the record is devoid of evidence that would permit the jury to legitimately conclude that A & S's alleged failure to have a maintenance program for the equipment was a proximate cause of the occurrence. In that regard, Mr. Schepp noted that neither of the two testifying experts had opined that a proper maintenance program would have prevented the accident. Mr. Schepp also sought the requested relief on the ground that the jury, in having found Grant 40% at fault, necessarily concluded that he had endeavored to remove the arc chute, thereby creating an unforeseeable intervening act that alone caused plaintiffs' injuries.

In response to the applications by Mr. Hoffman and Mr. Schepp, Ms. Resnick, on behalf of plaintiff Grant, stated: "I think the case law is clear that there can in fact be a negligent failure to warn without a finding of strict liability failure to warn." With respect to the issue of comparative fault, she advanced the view that the jury might have concluded that Grant either should have brought in an outside technician to check the switchbox, or that the problem with the switchbox might have been attributable to his failure, as the chief electrician at A & S, to properly maintain and inspect the equipment that ultimately caused his injury.

The subsequent written submissions by counsel basically mirror the oral arguments made immediately after the jury was discharged. The only major addition to those arguments was the position urged by Mr. Hoffman in his post-trial memorandum that if, arguendo, Westinghouse was responsible to plaintiffs, then A & S was responsible to Westinghouse pursuant to the claims set

---

1. "Total" meaning damages that have not been adjusted downward to reflect comparative fault.

forth in the third-party complaint. Moreover, Mr. Schepp, on behalf of A & S, sought a reduction in the amount awarded to plaintiff Grant for future medical expenses.

## DISCUSSION

A. *Claimed Inconsistency Between Jury's Verdict Finding a Negligent, but Not a Strict Tort Liability, Failure to Warn*

The standard for determining a motion for judgment as a matter of law is that:

> The "evidence must be viewed in the light most favorable to the party against whom the motion was made, and that party must be given the benefit of all reasonable inferences that might have been drawn in his favor from the evidence...."

*Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 889 (2d Cir.1988) (citations omitted).

■ To find a jury's verdict inconsistent, there must be "no rational, non-speculative way to reconcile two essential jury findings." *Witt v. Norfe, Inc.*, 725 F.2d 1277 (11th Cir. 1984). Accordingly, the Court should approach the record with the goal of trying to harmonize what is claimed to be an inconsistent verdict. Only if reconciliation is not possible should the jury's verdict be aborted and a new trial ordered. *Auwood,* 850 F.2d at 891.

■ The question, of course, is not how the jury fashioned its decision, but rather how it *might* reasonably have made its decision. That inquiry must be made within the context of both the factual record and the Court's charge. So viewed, may the jury's finding in the present case that Westinghouse was liable for a failure to warn under plaintiffs' negligence theory, but not under their strict products liability claim, be reconciled?

■ Initially it should be noted that, as a general proposition, a negligent failure to warn would subsume a strict products liability failure to warn so that the former could not exist without the latter. *See, e.g., Fane v. Zimmer, Inc.*, 927 F.2d 124 (2d Cir.1991); *Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 62,

423 N.Y.S.2d 95, 97 (4th Dep't 1979), *aff'd,* 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980). However, there are variables that may render that rule inapplicable. *See, e.g., Randall v. Warnaco, Inc.*, 677 F.2d 1226, 1232 (8th Cir.1982) ("We ... note ... that the cases discussing the relationship between strict liability and negligence for failure to provide adequate warnings are confusing.... In the present case, however, we need not confront the apparent inconsistencies in the application of the two theories of recovery. Here, the jury may have absolved Warnco of liability on the strict liability theory on the basis of product modification without precluding recovery under negligence"); *Grzesiak v. General Elec. Co.*, 68 N.Y.2d 937, 510 N.Y.S.2d 79, 502 N.E.2d 994 (1986) ("Their ... claim of inconsistency in that ... failure to warn was an element of both causes of action [viz. negligence and strict products liability] is negated by the charge on strict liability which in its concluding portion stated four elements required to be found before the toaster could be found defective using letters (a), (b), (c) and (d) to separate them but used no disjunctive. Thus, defendants may have been found negligent for failure to warn as to foreseeable use, but not strictly liable because one of the other three elements was not proved."); *Barry v. Manglass,* 55 N.Y.2d 803, 447 N.Y.S.2d 423, 432 N.E.2d 125 (1981).

In the present case, a review of the record and the Court's charge discloses the existence of two such variables, and, therefore, the jury's verdict was not inconsistent.

1. *The Jury's Point of Reference in Considering the Respective Failure to Warn Claims May Have Been Temporally Different*

■ In assessing the strict liability claim, the jury was required to focus on the condition of the product at the time it left Westinghouse's hands. With respect to the negligence claim, however, the jury also could have considered evidence of Westinghouse's conduct at a point later in time. Mr. Williams testified that Westinghouse had received reports that some of its machines developed loose wiring. Other testimony in-

dicated that such a condition would, over time, produce overheating and could cause the type of explosion described by the plaintiffs. One triggering factor for such a scenario would be the failure of a switchboard purchaser to maintain the equipment.[2] Should that failure be essentially absolute in the sense that the purchaser did not even perform rudimentary, and obviously necessary, maintenance tasks, it would be reasonable to find that the resulting danger could not be ascribed to an inherent defect in Westinghouse's switchboard or its accompanying warnings when it first entered the stream of commerce.[3]

Given the above information, the jury may have concluded that adequate warnings were present when the machine left the Westinghouse factory in the late 1960's on route to A & S,[4] but that additional and more visible warnings[5] were *thereafter* required, as loose connections were reported over a period of years as occurring in the field. (*See* Tr. at 1230, 1231, 1298, 1302.)

Before leaving the subject of a post-sale "duty to warn" as a possible predicate for the jury's verdict, mention should be made of the fact that the Court sustained an objection by Westinghouse to the following question asked by plaintiff Grant's counsel:

> In the time period between 1968 and 1986, are you aware of whether or not Westinghouse sent any type of instructions or manuals to its prior customers, including A & S, to alert them to the fact that there may be loose connections in their systems?

(Tr. at 1231.)

Although that question regarding manuals and instructions was not answered, other evidence made the jury aware that: (a) Westinghouse received complaints of loose connections for years after the sale of the A & S unit; (b) at time of the accident, there was no sticker, or other readily visible warning on the exterior of the switchboard indicating the danger associated with improper maintenance, or parenthetically, unskilled efforts to repair the machine[6] (Tr. at 1234); and (c) notwithstanding Westinghouse's extensive examinations of the trial witnesses, including its own and those appearing on behalf of the plaintiffs, there was no suggestion that such a warning sticker was ever

---

**2.** Neither plaintiffs' expert nor defendant's expert was prepared to testify with a reasonable degree of engineering certainty that A & S's negligent maintenance of the switchboard was a proximate cause of the accident. However, the jury may have so concluded based on the evidence in the record, including plaintiffs' description of how the accident happened, as well as the testimony of plaintiffs' expert, which explained problems associated with loose connections. *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 110–11, 463 N.Y.S.2d 398, 403, 450 N.E.2d 204, 209–10 (1983) ("Expert testimony with reference to proximate causation is not always required; in this case the jury could have found proximate causation from its consideration of the characteristics of the [product] and plaintiffs' description of how the accident happened"); *see also Locilento v. John A. Coleman Catholic High School*, 134 A.D.2d 39, 41, 523 N.Y.S.2d 198, 199 (3d Dep't 1987) ("In our view, the jury could readily infer that defendants' failure to provide protective equipment was a proximate cause of plaintiff's shoulder injury [sustained while playing football]. Plaintiff's expert witness and orthopedic surgeon both essentially testified that shoulder pads serve to decrease the potential of shoulder injuries. This testimony was sufficient to allow the jury to conclude that the failure to equip plaintiff with shoulder pads was a proximate cause of his resulting injury. In so holding, we fully recognize that neither witness could confirm that shoulder pads would have prevented plaintiff's injury.") (citations omitted).

**3.** It is undisputed that *no* maintenance was done on the A & S switchboard for at least 13 years prior to the accident (Tr. at 511–12), although there was testimony that a reasonable maintenance program would have entailed, at a minimum, annual inspections of the equipment.

**4.** A defective product, for purposes of strict tort liability, was defined in the Court's charge thusly: "A product is defective if it is not reasonably safe—that is, if the product is so likely to be harmful to persons that a reasonable person who had actual knowledge of its potential for producing injury would conclude that it should not have been marketed in that condition. A product can be defective in its design, manufacture or lack of adequate warning."

**5.** The original warnings, assuming, *arguendo*, that they were furnished, would have been located in a manual placed inside the machine (Tr. at 1314), rather than on a sticker, or other readily visible form affixed to the machine's exterior. (Tr. at 1235.)

**6.** For further discussion of the concept of "unskilled efforts to repair," see section entitled "Assumption of Risk and Negligence of Plaintiff Grant," *infra* at 816–817.

sent by Westinghouse to A & S and that A & S simply failed to affix it to the machine's exterior.

In sum, there was evidence in the record to permit the jury to properly conclude that the warnings that accompanied the switchboard when it was sold to A & S were adequate, but that subsequent events created an obligation to furnish additional warnings, which obligation was breached by the manufacturer.

2. *Reference to the Court's Charge Reinforces the Possibility That the Jury Legitimately Concluded That Westinghouse Was Negligent in Its Failure to Warn, but Was Not Liable for Such a Failure Under a Strict Products Liability Theory*

The "failure to warn" portion of the Court's charge regarding the negligence claim is as follows:

Applying the theory of negligence to the claim of failure to warn, the manufacturer of a product that is reasonably certain to be dangerous if used in a way which the manufacturer should reasonably foresee it would be used is under a duty to use reasonable care to give adequate warning of any dangers known to the manufacturer or which in the use of reasonable care the manufacturer should have known, and which the user of the product ordinarily would not discover. Reasonable care means that degree of care that a reasonably prudent person would exercise under the same circumstances.

If you find that defendant Westinghouse exercised reasonable care to give adequate warning, then you will find that defendant did not breach its duty to warn. If, however, you find that defendant did not exercise reasonable care to give adequate warning, you will find that it breached its duty to warn. But that will not end your inquiry.

If you find that defendant breached its duty to adequately warn, you must then determine whether the inadequate warning was a proximate cause of plaintiff's injuries; that is, if it had such an effect in producing the injuries that a reasonable person would regard it as a cause of the injuries. If you find that the breach was a proximate cause of a plaintiff's injuries, you will find for the plaintiff under this claim. If, however, you find that the breach was not a proximate cause of a plaintiff's injuries, you will find for defendant under this claim.

(Ct.Ex. 14 at 26–28.)

The relevant portion of the Court's charge on strict products liability reads as follows:

Each plaintiff also claims that defendant may be liable under the theory of strict products liability. According to this theory a manufacture who sells a product in a defective condition is liable for injury which results from the use of the product when the product is used for its intended or reasonably foreseeable purpose.

... *A product can be defective in its* design, manufacture, or *lack of adequate warnings.* ...

Thus, under the theory of strict products liability the first question you must answer is whether the defendant's switch and component parts were defective. Each plaintiff claims that defendant's products were defective not only because their design permitted a contact weld to occur, but also because they were improperly assembled and lacked sufficient warnings and instructions. ...

....

As I explained above, each plaintiff may prove that the products were defective by the fair preponderance of the direct and/or circumstantial evidence. If a plaintiff's strict products liability claim rests solely on circumstantial evidence, to find that the product was defective you must be satisfied that the evidence permits you to infer two things. First, that the evidence excludes all explanations for the occurrence except that the product was defective. Second, that the circumstances surrounding the occurrence were such that it would not have occurred unless the product was defective. If you are satisfied on both of these issues, the law permits, but does not require, you to infer from the happening of the accident that the product was defec-

tive. If you find that there is some reason other than the claimed defect that caused the accident, or that there was no defect, you will find for defendant on this issue.

If you find that defendant's products were defective, you must then proceed to determine whether the defect existed when it left the hands of the defendant.... If you find that the defect did not exist at the time the products left defendant's hands you will find for defendant under the theory of strict products liability.

(*Id.* at 28–32 (emphasis added).)

■ A comparison of the Court's charge regarding negligent failure to warn with its instruction regarding the theory of strict products liability demonstrates the following: (1) the Court's "negligent failure to warn" charge would permit the jury to conclude— based on the facts in the record as detailed previously—that Westinghouse was negligent *after* the product was released in the stream of commerce because of a problem that developed thereafter; and (2) by way of contrast, a failure to warn under a strict products liability scenario—as explained in the Court's charge—necessarily would include a determination that the product was defective when it left the manufacturer's hands. As to this latter theory of liability, the jury was further instructed that if the only credible evidence in their view that bore on the issue was circumstantial in nature, they could not find that the product was defective when it left the manufacturer's hands unless the evidence excluded all explanations for the occurrence except the claimed warnings defect. (Ct.Ex. 14 at 30–31.) No such limiting instruction concerning the evaluation of the evidence was provided to the jury with respect to the Court's general negligence charge (*id.* at 20–21, 22) or its specific negligence charge for failure to warn.[7] (*Id.* at 26–28.)

3. *Jury's Findings on Failure to Warn May Be Reconciled, and Thus the Verdict Does Not Suffer from a Fatal Inconsistency*

In sum, based on the evidence presented, the chronological reference points for deter-

mining the negligent failure to warn claim and the strict products liability failure to warn claim were not necessarily identical. Accordingly, the jury's findings may be reconciled.

This conclusion is reinforced by a perusal of the Court's charge, which again would permit the jury to use different points of reference for determining the issue of liability under each of the two theories. Moreover, reference to the charge indicates that there were differences in the instructions (*e.g.,* the circumstantial evidence language in the strict products liability portion of the charge that was absent from the negligent "failure to warn" portion), which would have permitted the jury to reach a different conclusion with respect to each of the theories of liability. Accordingly, given the facts in this case, viewed in conjunction with the charge, the jury's verdict is reconcilable and should stand.

B. *Waiver of Right to Seek a New Trial Based on Claimed Inconsistency of Jury's Verdict*

In the prior section of this decision, the Court found that the jury's verdict was not inconsistent because, *inter alia,* the jury may have used different points of temporal reference in determining the respective "failure to warn" claims. But, as explained below, even if there is an inconsistency in the verdict, such an object has been waived.

As a point of departure in this regard, a restatement of the following sidebar conference is in order:

THE COURT: Is there any reason I shouldn't discharge the jury? It seems to me they've done the job and I think the verdict sheet does not suffer from inconsistency.

MR. HOFFMAN: Not any that they can resolve.

THE COURT: Agreed?

MR. SCHEPP: Yes.

---

7. The Court's negligent manufacture charge, however, did contain a "circumstantial evidence" limiting instruction.

This conversation occurred immediately after the foreperson delivered the jury's verdict. Once the Court was assured by counsel that there was no reason to hold the jury, the jury was discharged from service.

Does this scenario estop the present movants from seeking relief from the jury's verdict based on its claimed inconsistency? Has the claimed defect been waived?

Various courts, including the Second Circuit Court of Appeals, have addressed these general issues. The answer provided typically hinges on the procedural history of the case. *See, e.g., Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48 (2d Cir.1992) (issue of inconsistency raised for first time on appeal; court held defendant waived its challenge to the jury verdict as inconsistent); *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir.1984) (no new trial required where objecting party failed to raise issue of inconsistency before the jury was discharged); *United States Football League v. National Football League*, 842 F.2d 1335, 1367 (2d Cir.1988) ("failure to bring alleged inconsistencies in the verdict sheet to the court's attention before the jury has been discharged waives the right to have the alleged inconsistencies remedied in a new trial"); *Barry v. Manglass*, 55 N.Y.2d 803, 806, 447 N.Y.S.2d 423, 425, 432 N.E.2d 125, 126–27 (1981) ("GM first raised this claim ... in connection with a post-trial motion for a new trial. By failing to raise this consistency before the jury was discharged, GM afforded the trial court no opportunity to correct the claimed error.... If the inconsistency had been raised, the trial court could have taken corrective action before the jury was discharged, such as resubmitting the matter to the jury"); *Lundgren v. McColgin*, 96 A.D.2d 706, 706, 464 N.Y.S.2d 317, 318 (4th Dep't 1983) ("Piper raised the issue of inconsistency prior to discharge of the jury and it thus may serve as a predicate for reversal."). *Compare Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884 (2d Cir.1988) (objection was raised after the jury was discharged but before the trial court entered judgment; held that claim of inconsistent *special verdicts* was not waived, and that trial court, therefore had an obligation to reconcile the verdicts, if possible, which task, incidentally, was successfully accomplished).[8]

◼ In considering the matter at hand in view of the decisions just cited, it is significant to note that both movants were fully aware of the claimed inconsistency at the time of the sidebar conference. Indeed, each counsel advanced precisely the same inconsistency argument that is presently before the Court at the moment the jurors exited the courthouse. As experienced litigators, they knew, or certainly should have known, that typically a jury that endeavors to return an inconsistent verdict is advised of the problem by the Court, and directed to resume their deliberations.

Under such circumstances, the alleged defect urged by Westinghouse and A & S has been waived. A contrary holding would result in the jury's work-product being unfairly scuttled, to the detriment of plaintiffs and plaintiffs' attorneys. If, *arguendo*, their ar-

---

**8.** *Auwood* involved *special* verdicts. The verdict sheet in the present case (Court Ex. 13) is mislabeled as a "Special Verdict" form. Because the jury was asked not only to answer certain factual questions, but to also make findings of ultimate liability, Court Exhibit 13 is, and should have been captioned as, a "General Verdicts Form with Written Interrogatories." This distinction is drawn in *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir.1992), and seems to render the holding in *Auwood* inapplicable for present purposes. As noted by the Second Circuit in *Lavoie*, "Rule 49(a) [of the Federal Rules of Civil Procedure] ... does not apply" to a general verdict with written interrogatories. Similarly, when "the alleged inconsistency to which the defendant points is between two *general verdicts* on different legal theories [viz. breach

of warranty, strict tort liability and negligence in *Lavoie*, and strict tort liability and negligence in the case at bar], and not between a general verdict and responses to interrogatories ... Rule 49(b) has no application." *Id.* at 52–54; *see also United States Football League v. National Football League*, 644 F.Supp. 1040, 1045–46 (S.D.N.Y.1986), *aff'd* 842 F.2d 1335 (2d Cir. 1988).

Moreover, the present case involves an element absent in the cases cited above, *viz.*, explicit assurances by counsel for the defendant and third-party defendant that neither an inconsistency in the verdicts, nor any other reason, precluded the jury from being discharged when, in fact, each attorney, at that moment, believed the verdicts to be flawed as inconsistent.

guments have merit, their silence at sidebar prevented the defect from being remedied on that day, by that jury, based on evidence presented over the course of the protracted and hard-fought trial. Rather than being sent home, the jury should have been permitted to return to the task at hand with the goal of returning a sound verdict.

### C. *Negligence of Westinghouse*

■ By way of a partial reiteration, sufficient evidence was placed before the jury to justify the conclusion that Westinghouse was negligent in failing to provide post-sale warnings upon learning of loose connections developing in its switchboards.

The Court also notes that, because any objection to inconsistency has been waived, *see supra* at 813–815, the Court's inquiry regarding the legitimacy of the jury's determination that Westinghouse negligently failed to warn need not be confined solely to post-sale events. The issue of whether Westinghouse also negligently failed to issue warnings *at the time of sale* may be factored into the equation. The jury's possible reliance on that claimed omission—as argued by plaintiffs' counsel and framed by the proof—would furnish another ground in support of their determination of negligence. As plaintiff Grant's counsel correctly notes, "there was disputed testimony as to whether Westinghouse provided instruction manuals [with the switchboard at the time of sale in 1968] which would set forth the necessity of periodic inspections and maintenance of its equipment. No such manuals were ever produced." (Resnick Apr. 7, 1994 Aff. at ¶ 5 (submitted in opposition to motions of Westinghouse and A & S).)

With respect to Westinghouse's argument that it had no duty to warn Grant, who knew, or should have known, about the potential dangers associated with a switchboard,[9] the evidence as to his expertise or professionalism was conflicting. He did testify that, as a professional, he was knowledgeable about electrical switches. But other evidence painted a different picture.

As a result of cross-examination by counsel for Westinghouse, the jury might have concluded that Grant gained his A & S position largely because of his leadership role in the International Brotherhood of Electrical Workers. Such evidence raised the specter that he was an electrician essentially in name only—being devoid of proper training and experience, he was not a "knowledgeable user" to whom no duty to warn would be owed.

Similarly, relying on the testimony of A & S Staff Electrician Roger McNair, Westinghouse again contends that A & S had knowledge of the potential damages of the switchboard. The jury, however, may have doubted the scope and sufficiency of McNair's purported professionalism. Such reservations could be grounded on their evaluation of his testimony, including his demeanor while on the stand, together with the fact that he appeared to be wholly "outside the loop" regarding the relevant events in this case. Parenthetically, there is nothing in the record to suggest that Westinghouse relied upon, or in any way adjusted its conduct, because of some perception that it had as to the competence of either of the two individuals. To the contrary, it appears defendant had no pre-litigation awareness of either Grant or McNair.

As mentioned previously, Westinghouse also maintains that even if, *arguendo*, it was negligent, its negligence was not a proximate cause of the accident. Grant's insertion of a screwdriver into the arc chute is said to constitute an intervening cause that severed the link between Westinghouse's conduct and plaintiffs' injuries. This claim will be discussed shortly.

### D. *Negligence of A & S*

A & S argues that "the evidence does not support the finding of the jury that third-party defendant's negligence in failing to

9. *See* Westinghouse Memorandum of Law in Support of Motion for Judgment as a Matter of Law at 10–13, 19–20.

have periodic inspections of the switchboard conducted caused plaintiffs' injuries...."[10]

■ Preliminarily, it is important to note that A & S does not contest the jury's finding that it was negligent in failing to inspect the switchboard. The only arguments made relate to proximate cause, and are predicated on the fact that neither of the experts who testified stated that proper maintenance would have prevented the accident. However, as explained in footnote 2, *supra*, the plaintiffs' description of how the accident happened, considered in conjunction with the experts' testimony of the problems associated with loose connections, provided sufficient information to support the jury's findings against A & S.

### E. Assumption of Risk and Negligence of Plaintiff Grant

Reference to the verdict form (Ct.Ex. 13) indicates that the jury found that Westinghouse had established the elements of its claim that the plaintiff William Grant was negligent and he assumed the risk of his own accident, and that his negligence and assumption of the risk were proximate causes of the occurrence. Based on that conclusion, they allocated 40% of the total fault to plaintiff Grant.

No one has challenged, or questioned the significance of, the jury's determination that Grant was negligent. However, both the defendant Westinghouse and third-party defendant A & S argue that the jury, by finding assumption of risk, necessarily found that Grant endeavored to partially disassemble the switch by removing the arc chute, notwithstanding his categorical testimony to the contrary. Each also claims that such an act would not have been foreseeable by either Westinghouse or A & S, and thus constituted a superseding, rather than a concurrent, proximate cause of the accident, thereby absolving them from liability as a matter of law.

### 1. Factual Predicate for Assumption of the Risk

Assuming for a moment that Westinghouse and A & S are correct in their argument that such errant repair efforts by Grant, if any, would not have been foreseeable and, accordingly would constitute a superseding cause of the accident,[11] the question becomes whether there was *another* factual predicate upon which the jury's finding of assumption of the risk and negligence could rest, which other ground could legitimately be considered as a concurrent, rather than superseding, cause of the accident.

■ Initially, it should be noted that the Court, in its charge, explained the concept of assumption of risk generally, and also set forth the factual claim of Westinghouse regarding that particular issue, namely that Grant removed the arc chute and inserted a tool into the switch. However, the mere fact that Westinghouse argued that Grant assumed risk under a claimed circumstance, and the Court mentioned Westinghouse's claim in its charge, does not mean the jury could only consider that circumstance in evaluating the conduct of Grant. If there was other evidence in the record that would support the conclusion that he assumed the risk in some other particular, the jury's decision might rest on such other ground. In this case, such other evidence was present. Among other things, Grant was the chief electrician on site. It was his responsibility to maintain the electrical equipment at the A & S facility. Yet he testified that he never inspected the equipment in question during his thirteen years of service. More particularly, he took no steps to determine whether there were any loose connections or signs of overheating in the equipment, even though simply placing a hand on the exterior of the machine would have disclosed the existence of the latter condition.

In view of the above circumstances, the jury might have found that Grant—given his position with A & S and his expertise—

---

10. *See* A & S Notice of Motion, dated March 14, 1994, at 2.

11. As will be discussed subsequently, it is the Court's view that Westinghouse and A & S are

incorrect in this regard because whether such an act constituted a concurrent or a superseding cause of the accident presented a factual issue for the jury's determination.

"*should* [at the very least] have known and fully understood the risk of harm" [12] that developed from Westinghouse's failure to issue adequate warnings and instructions with its product, as aggravated by his own failure to maintain and inspect the switchboard. Indeed, the thrust of plaintiffs' proof was that loose connections produced overheating within the machine, which, in turn, caused the unit to essentially explode in Grant's face when he endeavored to determine why the store's escalators had suddenly stopped.

Actual or constructive knowledge by Grant of the potential for injury associated with the failure to inspect or maintain the switchboard, viewed in conjunction with other evidence in the case, would support a finding that he impliedly assumed the risk that ultimately produced his injury. *See generally* 1 *New York Pattern Jury Instructions—Civil,* PJI 2:55, at 153 (Supp.1995) ("In *Arbegast* [*v. Board of Education,* 65 N.Y.2d 161, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985)], the Court of Appeals indicated that a failure to appreciate a known danger could constitute an implied assumption of risk.")

In sum, the maintenance/inspection scenario outlined above would serve as a proper predicate for the jury's assumption of risk finding, independent of Grant's alleged insertion of a screwdriver into the arc chute. Moreover, if that was the basis for their determination, it cannot be said that the concomitant implicit finding of shared or concurrent fault with Westinghouse is erroneous as a matter of law.

2. *Proximate Cause—Intervening Causes*

In any event, there is another view of evidence that would also support the assumption of risk finding, viz. that Grant did insert his screwdriver into the arc chute in an effort to repair the switchboard and restore power to the escalators. If he did so, certainly the jury's finding of assumption of the risk would properly lie, but that is not the focal point of the present dispute. Rather, the pivotal issue is whether such conduct would constitute a superseding cause of the accident as a matter of law, or whether it was for the jury to determine if that intervening act was a concurrent or superseding cause of plaintiffs' injuries.

■ For an intervening act or cause to be deemed superseding (*i.e.,* designated as the sole cause of an occurrence), it must have been "unforeseeable." Was what Grant supposedly did unforeseeable? The answer turns on how his conduct is defined. If it is defined as the precise act involved, as Westinghouse contends should be the case,[13] *i.e.* inserting a screwdriver into an arc chute, the answer is "yes." But if the conduct is defined in a broader sense, *i.e.* as an emergency effort by an on-site repairperson to reactivate a machine vital to the operation of a commercial establishment, the answer is "no."

Westinghouse has drawn the question too narrowly. In so doing, it ignores the fact that policy considerations have framed the law in this area, with the defining question being "at what point is a defendant whose negligent act or omission has contributed to an injury to be relieved of liability by reason of the fact that after his act or omission a new and independent cause comes into operation?" 1 *New York Pattern Jury Instructions—Civil,* PJI 2:72, at 212. Indeed, "to speak of an intervening 'cause' is misleading, for the problem is not one of causation but of policy concerning limitation of responsibility." *Id.; see also Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 314–15, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (1980).

The point at which a negligent defendant's responsibility to an injured party should be severed because of the intervening act of a third-party, or of the plaintiff as in the present case,[14] has been the subject of numerous decisions, which typically turn on the particular facts involved. Nonetheless, certain basic

---

**12.** See Court's charge on Assumption of Risk (Ct.Ex. 14 at 38 (emphasis added)), which was taken from 1 *New York Pattern Jury Instructions—Civil,* PJI 2:55 (Supp.1995).

**13.** *See* Westinghouse Memorandum of Law in Partial Opposition to Third–Party Defendant A & S's Motion for Judgment as a Matter of Law at 3.

**14.** *See Restatement (Second) of Torts* § 443 cmt. a (1965).

principles have emerged from the case law, which are well synopsized in the following excerpts from *Billsborrow v. Dow Chemical, U.S.A.,* 177 A.D.2d 7, 16, 579 N.Y.S.2d 728, 733 (2d Dep't 1992) (citations omitted):

> For there to be recovery for damages stemming from a product defective because of the inadequacy or absence of warnings, the failure to warn must have been a substantial cause of the events which produced the injury.
>
> Where an intervening act combines with the defendant's conduct to produce the plaintiff's injury "liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by defendant's negligence." Thus, an intervening act which is "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct ... may well break the causal nexus."

For purposes of determining intervening causation, the term "normal or foreseeable consequence" is far from self-explanatory. Clarification may be advanced by initially discussing what foreseeability does not mandate, and then focusing on how the term has been interpreted in post-verdict challenges to causation.

 It is clear that the original wrongdoer need not foresee the precise nature of the subsequent negligent act or omission. *Cf. Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 314–15, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (1980). In fact, the relevant Pattern Jury Instruction speaks in terms of "an act of the *kind* committed" by the plaintiff or third-person, rather than using the more restrictive word "act," in explaining conduct that could be deemed a "probable consequence of the defendant's negligence." 1 *New York Pattern Jury Instructions—Civil,* PJI 2:72 (Supp.1995) (emphasis added). Similarly, the mere fact that the intervening act was negligent, *see Restatement (Second) of Torts* § 442B cmt. b, illus. 6 (1965), or even criminal in character, *id.* at § 448, is not dispositive, nor is the fact that the accident would not have happened but for the intervening act. *Foley v. State,*

265 A.D. 682, 41 N.Y.S.2d 256, 259–60 (4th Dep't 1943).

Having indicated some of the circumstances that will not destroy "foreseeability," let us now discuss the meaning of the term directly. What does foreseeability mean in the present context?

Although foreseeability, as a matter of semantics, is prospective in nature, courts have infused into the analysis of intervening causation an element of hindsight. Along the same lines, the word "normal" does not mean usual, customary or standard. This approach is explained in the following excerpt from Comment (b), Section 443, of the Restatement (Second) of Torts:

> When a negligently driven automobile hits a cow, it is scarcely to be regarded as usual, customary, or foreseeable in the ordinary sense in which that word is used in negligence cases, that the cow, after lying stunned in the highway for five minutes, will recover, take fright, and make a frantic effort to escape, and that in the course of that effort it will charge into a bystander, knock him down, and injure him. But in retrospect, after the event, this is not at all an abnormal consequence of the situation which the driver has created. It is to be classified as normal, and it will not operate as a superseding cause which relieves the driver of liability.

The same principle is underscored by Professors Prosser and Keeton:

> It must be conceded that "intervening cause" is a highly unsatisfactory term, since we are dealing with problems of responsibility, and not physics....
>
> The number and variety of causes which may intervene, after the negligence of the defendant is an accomplished fact, are obviously without any limit whatever. In the effort to hold the defendant's liability within some reasonable bounds, the courts have been compelled, out of sheer necessity and in default of anything better, to fall back upon the scope of the original foreseeable risk which the defendant has created....
>
> But here, ... this overworked and undefined word covers a multitude of sins. It is

at least clear that in many cases recovery has been allowed where the intervening cause was not one which any reasonable actor could be expected to anticipate or have in mind, but it is regarded as "normal" to the situation which the actor has created. In other words, although the theory of the cases is one of foreseeability, a considerable element of hindsight may have entered into its practical application. W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 44, at 302–03 (5th ed. 1984).

■ The New York Court of Appeals recognizes the practice of utilizing hindsight in determining at what point an initial wrongdoer should be insulated from responsibility due to the subsequent actions of another. *See generally Martinez v. Lazaroff*, 48 N.Y.2d 819, 822, 424 N.Y.S.2d 126, 129, 399 N.E.2d 1148, 1150–51 (1979) (Meyer, J., dissenting) ("the word 'normal' is *not* used in the sense of usual, foreseeable or to be expected, but means rather 'that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall outside the class of normal events'") (citing *Restatement (Second) of Torts* § 442 cmt. b (1965)).

Absent an understanding that both hindsight and policy considerations largely define the interrelationship between foreseeability and intervening causation, many court decisions addressing the subject would be enigmas, for the particular acts or events involved would not be foreseeable, in a literal sense, except to a clairvoyant on his or her best day. *See, e.g., Clinton v. City of New York*, 140 A.D.2d 404, 528 N.Y.S.2d 108 (2d Dep't) (verdict against general hospital affirmed where plaintiff patient was repeatedly stabbed by another patient with a pair of hospital suture scissors that the hospital negligently left by the assailant's bed for an extended period of time; neither patient was a psychiatric patient, nor had the assailant previously evidenced any violent propensities), *appeal denied*, 73 N.Y.2d 703, 537 N.Y.S.2d 491, 534 N.E.2d 329 (1988); *In re Guardian Casualty Co.*, 253 A.D. 360, 2 N.Y.S.2d 232 (1st Dep't) (two automobiles collided, one of which hit a structure; twenty minutes later, a stone from that structure fell as the car was being removed from the accident site; the stone struck and killed a pedestrian; defendants held responsible under the rationale that "where the acts of the defendant gave rise to the stream of events that culminated in the accident, such acts are held the proximate cause"), *aff'd*, 278 N.Y. 674, 16 N.E.2d 397 (1938).

Consistent with the above explanations of what "foreseeable" and "normal" mean in the present context, the question of whether Grant's alleged negligent insertion of a screwdriver into the arc chute constituted a superseding cause of his accident as a matter of law, may be framed as follows: "if the new cause is set in operation by defendant's original wrongful conduct and is not independent of it, defendant is not relieved of responsibility. The inquiry must always be whether the injury was produced by a self operating intermediary cause disconnected from the primary fault." *See* 1 *New York Pattern Jury Instructions—Civil*, PJI 2:72.

Alternatively, and again viewing the situation partially with hindsight, if "the intervening act is independent, defendant will [still] not be relieved of liability if the intervening act is one that naturally flows from the original wrongful act…." *Id.*

■ A juxtapositioning of the facts in the present with the above general principles of law indicates that the jury could have legitimately concluded that Grant's errant efforts to repair, if any, were "set in operation by defendant's original wrongful conduct and … [were] not independent of it." Even if, *arguendo*, Grant's conduct was independent of defendant's original wrong, it "naturally flows" from that wrong and thus remains legally traceable to Westinghouse's negligence. Indeed, it could be argued that it would have been unusual for a person in Grant's position not to have tried to repair the switchboard and reactivate the escalators in A & S under the circumstances. His alleged conduct, negligent as it may be, was triggered by and flowed from Westinghouse's wrongful conduct.

Such a conclusion by the jury would harmonize with the Court's instruction regarding foreseeability. Granted, Westinghouse could not be expected to foresee the precise manner in which Grant was injured, but it could foresee the likelihood that an individual would negligently endeavor to make emergency repairs to the stalled equipment and be injured in the process.

■ In sum, even if the jury's finding of comparative fault against Grant is based on the belief that he tried to remove the arc chute, its concomitant finding that such an act was a concurring, rather than superseding cause of the accident would not be erroneous as a matter of law. Such causal issues typically present questions of fact, as is the case here. *See, e.g., Lavoie v. Pacific Press & Shear Co.,* 975 F.2d 48, 57–58 (2d Cir. 1992); *Billsborrow v. Dow Chemical, U.S.A.,* 177 A.D.2d 7, 18, 579 N.Y.S.2d 728, 734–35 (2d Dep't 1992); *Bottone v. New York Telephone Co.,* 110 A.D.2d 922, 487 N.Y.S.2d 170 (3d Dep't), *appeal denied,* 65 N.Y.2d 610, 494 N.Y.S.2d 1026, 484 N.E.2d 1053 (1985).

F. *Excessive Award for Future Medical Expenses*

The jury awarded the plaintiff Grant $10,-000 for future medical expenses.

One witness, Robert Scher, M.D., a board certified ophthalmologist, testified on the subject. His testimony indicated that: (a) the plaintiff Grant sustained an 85% loss of vision in his left eye; (b) a corneal transplant was required to correct the condition; and (c) the cost for such a procedure would be "somewhere in the area of $4,000 to $5,000 just for the surgeon." (Tr. at 647.)

No other information was before the jury relating to the nature and cost of any related health services that might be required, whether it would be appropriate to conduct the operation now or later, or whether the cost of the procedure was likely to increase or decrease in the future and, if so, by how much. As a result, A & S has asked that the award for future medical damages be stricken to the extent that it exceeds $5,000.

■ Granted, precision is not required of a jury in fashioning an award for future medical damages, assuming that the award made has some evidentiary basis in the record. Along the same lines, a jury in an appropriate case may take notice that medical expenses are likely to escalate in the future. *Nelson v. New York,* 105 Misc.2d 107, 122, 431 N.Y.S.2d 955, 966 (Ct.Cl.1980). But here, given the paucity of information, the figure of $10,000 had to be the product of pure speculation. *See generally Thornton v. Montefiore Hospital,* 120 Misc.2d 1003, 1006–07, 469 N.Y.S.2d 979, 982 (Sup.Ct.1983), *aff'd in part, modified in part,* 99 A.D.2d 1024, 473 N.Y.S.2d 758 (1st Dep't 1984); *Fuchstadt v. United States,* 442 F.2d 400, 404 (2d Cir. 1971). Accordingly, a new trial is ordered on this issue alone, unless the plaintiff Grant agrees to accept $5,000 for his future medical expenses, rather than the $10,000 awarded by the jury.

## CONCLUSION

For the reasons above stated the motions of Westinghouse and A & S for judgment as a matter of law or, alternatively, for a new trial are denied, except to the extent the jury's award of $10,000 to the plaintiff Grant for future medical expenses is found to be excessive.

As to that item, a new trial is to be held, unless the plaintiff Grant stipulates to accept $5,000 for such damages.

SO ORDERED.