Nancy A. Billsborrow, Individually and as Administratrix of the Estate of Christopher Billsborrow, Deceased, Respondent, v Dow Chemical, U.S.A., et al., Defendants, and Third-Party Plaintiffs-Appellants, et al., Defendants. Welmetco, Ltd., Third-Party Defendant-Appellant.

Second Department, February 18, 1992

### APPEARANCES OF COUNSEL

*Jacob, Medinger & Finnegan (Glenn J. Pogust* of counsel), for Dow Chemical Company, defendant and third-party plaintiff-appellant.

*Bower & Gardner (Steven J. Ahmuty, Jr.,* of counsel), for Pride Solvent & Chemical Company, Inc., defendant and third-party plaintiff-appellant.

*Chesney, Murphy & Moran (Elizabeth O'Neill* of counsel;

*Peter J. Verdirame* on the brief), for Welmetco, Ltd., third-party defendant-appellant.

*O'Connor and Hayes, P. C. (James E. Hayes, John R. O'Connor,* and *Robin Mary Heaney* of counsel), for respondent.

### OPINION OF THE COURT

THOMPSON, J.

On August 12, 1978, the plaintiff's 22-year-old decedent, Christopher Billsborrow, died from cardiac arrest caused by the inhalation of highly toxic vapors from a chlorinated solvent known as trichloroethylene. At the time of his death, Billsborrow, an employee of Welmetco, Ltd. (hereinafter Welmetco), was engaged in cleaning a vapor-degreasing machine owned by Eastern-Salkover Metal Processing Corp. (hereinafter Eastern). Welmetco was a sheet metal manufacturer in Melville, New York. Eastern, an affiliated corporation, processed metal parts and was located at the same Melville premises as Welmetco. Dow Chemical, U.S.A. (hereinafter Dow), manufactured and sold trichloroethylene under the brand name Neu-Tri. The chemical solvent which produced Billsborrow's fatal injuries was alleged to have been Neu-Tri which Dow sold in bulk to Pride Solvent & Chemical Company, Inc. (hereinafter Pride). Pride distributed Neu-Tri to Welmetco and Eastern.

This action was commenced by the decedent's wife Nancy Ann Billsborrow, individually and as administratrix of his estate, against Dow and Pride, alleging negligence and strict liability upon the theory that they had failed to warn of the dangers involved in the use of Neu-Tri, and against Eastern upon the theory that it failed to provide the plaintiff's decedent with a safe place to work and failed to warn the decedent of Neu-Tri's dangerous propensities or to provide adequate instructions on its use. Dow and Pride impleaded Welmetco, alleging that it failed to provide the decedent with a safe work place because it failed to provide proper safety equipment or to provide proper training or supervision of the decedent in the cleaning of the degreasing machine.

Following a jury trial, a verdict was returned in favor of the plaintiff. The principal issues on the appeals of Dow and Pride are whether the trial court committed reversible error in refusing to charge the jury that if Welmetco actually had knowledge of the hazards posed to employees using trichloroethylene, its negligence in failing to warn the decedent of such

dangers or to provide him with a proper breathing apparatus to filter out the noxious vapors constituted a superseding or intervening cause which, as a matter of law, relieved Dow and Pride of liability for the plaintiff's decedent's injuries. Although we find no basis on this record for concluding, as a matter of law, that Welmetco's negligence, if any, was a superseding cause, the question of superseding or intervening cause should have been submitted to the jury as a question of fact for its determination. The jury could have found Welmetco's negligence so extraordinary under the circumstances that the death of the plaintiff's decedent was not a foreseeable consequence of any negligence on the part of Dow or Pride in failing to provide adequate warnings. We therefore reverse the judgment insofar as appealed from and grant a new trial to the appellants.

## I

The evidence at the trial indicated that prior to his death, Christopher Billsborrow was employed since January 1978 as a shipping clerk and "general helper" at Welmetco. Welmetco and Eastern were affiliated corporations that occupied adjoining portions of premises at 70 Marcus Drive, Melville, New York. Henry Medina was the president of Welmetco and Eastern and his brother George Medina was the vice-president and manager of Welmetco. On August 11, 1978 George Medina took Billsborrow to the Eastern side of the premises for the stated purpose of having Pat Haggarty of Eastern train him to clean a vapor-degreasing machine, used to clean soiled metal parts. The degreasing machine which was owned by Eastern was five feet wide by five feet long and five feet deep and was situated in a seven-foot-deep concrete pit. In order to remove grease and wax from metal parts, trichloroethylene was poured into the degreaser and heated to create a vapor. Periodically, the trichloroethylene had to be removed from the degreaser as it became dirty, and the accumulated sludge and residue scraped out of the tank. Although the pit itself had no exhaust flue to evacuate accumulated vapors or fans to circulate air in the pit, the degreasing tank had a blower.

The next day, August 12, 1978, Billsborrow worked overtime and was assigned the task of cleaning Eastern's degreasing machine. Billsborrow had engaged in this task only once, several months previously. The process involved draining the trichloroethylene through a valve located in the center of the

tank floor and then, using a scooper mounted on the end of a long pole, scraping the residue of grease and trichloroethylene off the inside walls of the degreaser and depositing it in a disposal barrel. George Medina testified that employees were instructed in safety procedures to follow when using trichloroethylene to clean the degreaser. They were instructed by the supervisor not to enter the tank, to wear rubber gloves and protective glasses, not to splash any of the degreasing solution, to ensure that the area was adequately ventilated by opening windows and doors and turning on blowers and fans, and to work with an assistant.

When George Medina arrived at the plant on the morning of August 12 he saw Billsborrow near the degreaser. Billsborrow advised George how he had already emptied the degreaser tank using a sump system he had created. When George Medina remarked that the mask Billsborrow was carrying in his hand was not customarily used in cleaning the tank, Billsborrow responded that he was using one like it while cleaning the tank. Testimony revealed that the mask Billsborrow was using was of a type designed to filter out only ammonia fumes and dust, and could not protect a wearer against trichloroethylene fumes. Apparently, Welmetco's policy was not to require the use of respirators on the theory that if an employee were permitted to smell the fumes he would be repelled by the odors from areas in which there was an unhealthy concentration of chemical vapors. George Medina expressed ignorance of the fact that the longer one was exposed to trichloroethylene the less one could smell it.

Although the doors of the loading area were open on the date of the accident, Billsborrow did not have the blower on the degreasing machine turned on nor did George Medina recall instructing him to activate it. George Medina also did not recall observing any fans in use or exhaust system operating to ensure proper ventilation around the degreasing pit. After learning that Billsborrow was undertaking the cleaning of the degreasing machine alone, George Medina assigned another employee, Hermino Ramos, to assist him. Ramos had never cleaned a degreasing machine before and no one had warned him of the dangers of using trichloroethylene or trained him with regard to safety procedures. Ramos confirmed that no fans were activated during the process nor were any danger signs posted. The main cleaning task was performed by Billsborrow, who climbed into the degreasing tank and shoveled sludge into a bucket which he then handed

to Ramos who remained outside the tank at the rim of the rectangular pit. Billsborrow then flushed the walls of the tank with several buckets of trichloroethylene. On his last trip into the tank to open the drainage valve, Billsborrow was overcome by the noxious vapors. As he struggled to climb out of the pit, Billsborrow suddenly clutched at his mask and collapsed. Attempts to resuscitate Billsborrow were unsuccessful. His death was caused by cardiac arrest brought on by exposure to high concentrations of trichloroethylene vapors.

The evidence adduced at the trial revealed that the trichloroethylene used by Welmetco and Eastern was a product manufactured and sold by Dow under the name "Neu-Tri" and distributed to them by Pride. Dow sold Neu-Tri to Pride in bulk, which was delivered by tank truck. Pride, in turn, delivered Neu-Tri to Welmetco and Eastern in bulk by tank truck, and transferred the chemical from the tank truck into a storage tank located near the vapor degreaser. On rare occasions Neu-Tri was delivered in 55-gallon drums. While Dow provided warning labels to be affixed to the 55-gallon drums, it did not have a policy regarding the labeling of storage tanks or vapor degreasers on the premises of the end user of the chemical to warn of the hazards associated with its use. Dow did provide labels to be posted in areas where Neu-Tri was used, with instructions on how to clean up spills of the chlorinated solvent.

The distributor agreement between Dow and Pride provided that Pride was to disseminate in a timely manner to all purchasers and end users of Dow products any information provided by Dow regarding the safe handling, use and disposal of Dow products. Toward that end, Laurence Mackey, the Dow sales representative assigned to the Pride account, testified that he visited each of the distributors in his sales area on a regular basis, at which time he would provide them with Dow's product literature. He conducted an annual seminar for Pride sales persons, during which topics such as safety rules, handling precautions, and toxicity information on Dow products and Dow literature on those topics were reviewed and discussed.

Mackey was familiar with the hazards posed by the use of Neu-Tri through training sessions as well as from Dow literature on the subject. One such brochure disseminated in 1975 entitled "For Stability and Purity: Dow's Family of Trichloroethylene Solvents" indicated that Neu-Tri's vapors are heavier than air and tended to concentrate in unventilated spaces

such as degreasing tanks. Therefore, entry into a degreaser without proper breathing apparatus and protective equipment posed the risk of exposure to high vapor concentrations. Such exposure could cause "dizziness, unconsciousness or even death". The brochure went on to describe proper handling precautions and safety rules to be followed when using Neu-Tri. From the various source materials, Mackey learned that exposure to trichloroethylene under certain circumstances could cause dizziness, nausea, vomiting, and other untoward effects including death from oxygen deprivation or cardiac arrhythmias.

Mackey claimed that he encouraged the president of Pride to have all of his sales people carry Dow literature in their cars for review with their customers. Indeed, he recalled personally observing a box of Dow literature in the automobile trunk of Pride salesman Martin Abbene, who was responsible for the Welmetco/Eastern account.

Abbene recalled providing to Welmetco and Eastern a Dow publication entitled "Modern Vapor Degreasing" which, *inter alia,* prescribed the manner of handling chlorinated solvents such as Neu-Tri and safety precautions to be followed as well as instructions on the maintenance and cleaning of degreasers. During the period that he serviced the Welmetco/Eastern account, Abbene provided other Dow literature detailing safety measures for use of chlorinated solvents and warning labels which were to be affixed to the degreasing machine. Abbene visited the Welmetco/Eastern premises on numerous occasions. During those visits, Abbene reviewed some of the Dow literature concerning Neu-Tri's toxicity and advised the Medinas to read the materials thoroughly. Although he observed the degreaser on one visit, Abbene did not see any labels on or near the machine. Abbene did not discuss with the Medinas the proper ventilation of the degreasing machine. Furthermore, because he had never heard of Neu-Tri being used to clean a vapor degreaser, Abbene never instructed Welmetco and Eastern not to clean their machine with Neu-Tri.

An investigation by an inspector from the Office of Safety and Health Administration (hereinafter OSHA) after Billsborrow's death revealed that there were no written safety programs, written procedures or formal training programs at Welmetco. Training was supplied on an "as-needed" basis. The OSHA report stated that Billsborrow's employers were unaware that trichloroethylene was sufficiently toxic to cause

death. However, the OSHA investigator testified that the Medina brothers indicated they were aware of the toxic dangers posed by trichloroethylene to the extent that they knew the chemical could make a user feel sick. Notably, in a preaccident OSHA visit in 1978, the Medinas were advised that trichloroethylene was a very dangerous material and had caused many fatalities.

Over the defendants' combined objections, the trial court bifurcated its instructions between the claims against the main defendants and the third-party claims against Welmetco. In the first stage, the jury was instructed to consider the conduct of Dow, Pride and Eastern and expressly instructed not to consider the conduct of Welmetco. The court refused to charge on the issue of superseding or intervening cause, i.e., that Welmetco's conduct could break the chain of causation, thereby relieving Dow and Pride from liability for the plaintiff's decedent's injuries.

In response to the court's interrogatories, the jury found that while Dow was not required to give notice of the hazards of trichloroethylene to ultimate users of the product, such as Billsborrow, and that Dow's literature gave adequate warning of the dangers associated with trichloroethylene under the circumstances of this case, it had failed adequately to disseminate the literature concerning Neu-Tri's dangers in an effort to ensure that knowledge of such hazards reached the end user of the product. The jury found that Dow's failure in the chain of communication was a proximate cause of Billsborrow's death.

With regard to Pride, the jury concluded that Pride was not required to make itself aware of Eastern/Welmetco's operations, training or safety procedures, or to learn every use to which Eastern/Welmetco put trichloroethylene. However, the jury found that the efforts of Pride's salesman Martin Abbene in the chain of communication were not reasonable and adequate and those deficiencies were a proximate cause of Billsborrow's death.

The jury also unanimously found that Eastern did not comply with Labor Law § 200 and that that violation was a proximate cause of Billsborrow's death.

In the second stage of the charge, the court instructed the jury with regard to Welmetco's fault. The jury was further charged to apportion fault among the three primary defendants and Welmetco if it found Welmetco to be at fault. In its

response to the second set of interrogatories, the jury found Welmetco violated seven OSHA regulations as well as sections of the New York State Industrial Code regarding the use of hazardous materials and that those infractions violated Labor Law § 200 and were a proximate cause of Billsborrow's death. The jurors further concluded that the Medinas were aware of the hazards of trichloroethylene but had neglected to warn their employee adequately of the hazards and were negligent in permitting Billsborrow to clean the degreaser wearing an ammonia mask.

## II

As stated, the theory of the plaintiff's cause of action against the manufacturer and distributor of Neu-Tri was that they failed to discharge their duty to warn or instruct of possible dangers in the use of the product. Although Dow and Pride raise numerous issues alleged to relieve them of liability based upon the doctrines of "responsible intermediary" and/or "knowledgeable user",* we will address what is the dispositive issue on this appeal, namely, whether the issue of Welmetco's conduct as a possible intervening or superseding cause should

---

* The doctrines of "responsible intermediary" and "knowledgeable user" are similar in that they may be applied to relieve a manufacturer of liability. The responsible intermediary doctrine has been applied in New York in cases involving prescription drugs to relieve a drug manufacturer of liability on the theory of a failure to warn the ultimate user of the dangers of the product because a prescribing physician generally is knowledgeable of the dangers of the product and is capable of passing the knowledge on to the ultimate user, i.e., the patient (see, Wolfgruber v Upjohn Co., 72 AD2d 59, affd 52 NY2d 768). Thus, the physician stands as the "responsible intermediary" between the manufacturer and the patient, and once the manufacturer is found to have provided adequate warnings to physicians, it cannot be held liable to the patient on a failure to warn theory. Upon the defendants' motion for summary judgment in this case, the trial court refused to extend the responsible intermediary doctrine to bulk suppliers of chemical substances (see, Billsborrow v Dow Chem., 139 Misc 2d 488, 492; cf., Rivers v AT&T Technologies, 147 Misc 2d 366, 372). In the framework in which this appeal is presented, we do not address whether a bulk supplier of chemicals may be considered a "responsible intermediary". The "knowledgeable user" doctrine is a related concept which relieves a manufacturer of liability on a failure to warn theory where the purchaser or user knows or has reason to know of the dangerous propensities of the product independent of the information supplied to him by the manufacturer or distributor (see, e.g., Rosebrock v General Elec. Co., 236 NY 227; Goodbar v Whitehead Bros., 591 F Supp 552, affd sub nom. Beale v Hardy, 769 F2d 213 [4th Cir 1985]; but see, Howard Stores Corp. v Pope, 1 NY2d 110; see generally, Annotation, Failure to Warn as Basis of Liability Under Doctrine of Strict Liability in Tort, 53 ALR3d 239 [1973]).

have been submitted to the jury for resolution. It is commonly held that a product may be defective because of a manufacturer's failure adequately to warn of the risks involved in the use of the product *(see, e.g., Voss v Black & Decker Mfg. Co.,* 59 NY2d 102, 106-107; *Robinson v Reed-Prentice Div.,* 49 NY2d 471, 478-479). For there to be recovery for damages stemming from a product defective because of the inadequacy or absence of warnings, the failure to warn must have been a substantial cause of the events which produced the injury *(see, Amatulli v Delhi Constr. Corp.,* 77 NY2d 525, 532; *Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315). Where an intervening act combines with the defendant's conduct to produce the plaintiff's injury, "liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence" *(Derdiarian v Felix Contr. Corp., supra,* at 315). Thus, an intervening act which is "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct * * * may well be a superseding act which breaks the causal nexus" *(Derdiarian v Felix Contr. Corp., supra,* at 315; *see,* Prosser and Keeton, Torts § 44 [5th ed]).

There are instances "where only one conclusion may be drawn from the established facts [that] the question of legal cause may be decided as a matter of law" *(Derdiarian v Felix Contr. Corp., supra,* at 315; *see, Amatulli v Delhi Constr. Corp., supra,* at 534; *Howard v Poseidon Pools,* 72 NY2d 972, 974). Thus, in *Martinez v Lazaroff* (48 NY2d 819), the court held that where a landlord negligently failed to supply the tenants with hot water, he was not liable for injuries suffered by the infant plaintiff when the infant collided with a pot of hot water his father was carrying. The intervention of the father in transporting a pot of hot water from a substitute source produced the injuries to his son, and those injuries were not of a kind normally expected to ensue from a failure to provide hot water. The Court of Appeals concluded, as a matter of law, in a series of negligence cases arising out of diving accidents in swimming pools, that the reckless conduct of the respective plaintiffs constituted an unforeseeable superseding event sufficient to break the causal chain or was the sole proximate cause of their injuries *(see, Howard v Poseidon Pools, supra; Manning v Manning,* 72 NY2d 972; *Boltax v Joy Day Camp,* 67 NY2d 617; *Smith v Stark,* 67 NY2d 693). On the strength of these principles, Dow and Pride urge that Welmetco's

negligent failure to warn its employee of the dangers associated with trichloroethylene and its negligent failure to provide the decedent with a respirator sufficient to filter out trichloroethylene vapors were unforeseeable superseding events sufficient to absolve them of liability as a matter of law. We do not believe that such a conclusion may be reached here.

The questions of whether an act is foreseeable and in the course of normal events are indispensable in a determination of legal causation and are generally subject to varying inferences best left to the finder of fact to resolve (see, Lynch v Bay Ridge Obstetrical & Gynecological Assocs., 72 NY2d 632, 636-637; Derdiarian v Felix Contr. Corp., supra, at 315; see also, Amatulli v Delhi Constr. Corp., supra, at 535; Kriz v Schum, 75 NY2d 25, 36-37). Restatement (Second) of Torts § 443 provides that where an intervening act is a normal consequence of the situation created by a defendant's negligence, it does not constitute a superseding cause insulating the defendant from liability (see, Lynch v Bay Ridge Obstetrical & Gynecological Assocs., supra, at 636-637).

Turning to the present appeal, we cannot find, as a matter of law, that the third-party defendant Welmetco's negligence was a superseding cause which interrupted the link between the negligence of Dow and Pride and the plaintiff's decedent's injuries. The inadequacy of the warnings disseminated by both Dow and Pride in the chain of communication with respect to the product Neu-Tri, as found by the jury, threatened the ultimate end user of Neu-Tri by creating a situation where the user may not have been aware of the hazards and the safety devices to protect against the hazards. Pride's salesman admitted that he did not remind the Medinas to post one of Dow's warning labels on Eastern's vapor degreaser or trichloroethylene storage tank even though he did not observe any posting of warning labels during his routine visits to the premises. Billsborrow could have learned from such a posting of warnings what he needed to know to protect himself from the toxic vapors. Thus, it is apparent that this record does not present a circumstance where "only one [legal] conclusion may be drawn from the established facts" (Derdiarian v Felix Contr. Corp., supra, at 315). Rather, whether the Medinas' negligence in failing to give Billsborrow adequate warnings or proper safety apparatus was so extraordinary as to fall outside the class of normal consequences resulting from the main

defendants' conduct presented a factual question for resolution by a jury.

That the circumstances of this case present a question of fact for the jury is clear from the case of *McLaughlin v Mine Safety Appliances Co.* (11 NY2d 62). In *McLaughlin,* the court reversed a judgment in favor of the plaintiffs and ordered a new trial, finding that the jury was not properly instructed on the issue of an intervening act of negligence creating a break in the chain of causation. In that case, an infant, who had nearly drowned, was being revived with the aid of heat blocks by several firemen and a woman identified as a nurse. The firemen removed the blocks from their containers, upon which were printed instructions for their proper use, activated the devices, and then turned them over to the nurse, who applied the heat blocks to the infant. Contrary to the instructions that the heat blocks should be wrapped in insulation, the nurse applied some of them directly on the child's body, causing her to suffer severe burns. The court held that the trial court should have charged the jury that if the firemen had actual knowledge of the need for insulation of the heat blocks but removed the blocks from their containers, thereby depriving the nurse of any opportunity to read the instructions and, then, after activating the devices, observed without comment the nurse applying the heat blocks directly on the infant's skin, their negligence was so gross as to supersede any negligence of the distributor of the product and to insulate the distributor from liability. The court concluded that: "In short, whether or not the distributor furnished ample warning on his product to third persons in general was not important here, if the jury believed that [the fireman] had actual notice of the danger by virtue of his presence at demonstration classes or otherwise, and that he deprived the nurse of her opportunity to read the instructions prior to applying the blocks. While the distributor might have been liable if the blocks had found their way into the hands of the nurse in a more innocent fashion, the distributor could not be expected to foresee that its demonstrations to the firemen would callously be disregarded by a member of the department" *(McLaughlin v Mine Safety Appliances Co., supra,* at 71-72).

At bar, the trial court in the first instance erred in bifurcating the jury's deliberations by instructing them to ascertain initially whether the three defendants in the main action were at fault without considering the fault of the third-party

defendant. This procedural course prejudiced the main defendants by precluding the jury from properly considering their defenses. Those defenses were largely predicated upon Welmetco's alleged independent knowledge of the dangers inherent in the use of trichloroethylene, which Dow and Pride contended relieved them of their duty to warn and, further, upon Welmetco's intervening acts of negligence which Dow and Pride argued broke the causal chain. The prejudice stemming from the trial court's error was compounded by the trial court's refusal to charge the jury, either during the first stage of deliberations or during the second stage in which liability was to be apportioned, regarding the theory of intervening or superseding cause. We are convinced that such an instruction was called for under the circumstances of this case, where the evidence suggests and, indeed, the jury found, that the decedent's employers knew of the hazards of trichloroethylene but failed to warn him of such hazards and stood idly by as he entered the degreasing tank wearing an ammonia mask which the employers knew offered no protection against trichloroethylene vapors *(see, Cohen v St. Regis Paper Co.,* 65 NY2d 752; *McLaughlin v Mine Safety Appliances Co., supra).* We note that the interrogatories submitted to the jury in compound form rendered many of its responses unintelligible. Those interrogatories should be simplified upon retrial.

Although there is to be a new trial, we take note of the recent decision of the New York Court of Appeals with respect to the manner in which interest pursuant to EPTL 5-4.3 is to be calculated on a wrongful death award *(see, Milbrandt v Green Refractories Co.,* 79 NY2d 26). In *Milbrandt,* the Court of Appeals held, *inter alia,* that preverdict interest pursuant to EPTL 5-4.3 should not be added "to an award for postverdict losses if the award has not been discounted to a time prior to the award; and (2) that preverdict interest on an award for past losses that have accrued from the date of death to the date of the verdict should be calculated under the method in CPLR 5001(b)", that is, "by calculating the interest 'upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date' " *(Milbrandt v Green Refractories Co., supra,* at 31, 37-38, quoting from CPLR 5001 [b]). At bar, the Supreme Court entered a judgment which provided for preverdict interest on that portion of the wrongful death award which comprised "future" losses, a practice which the Court of Appeals in *Milbrandt* ruled impermissible, where, as here, the award is not dis-

counted to the date of death *(see, Milbrandt v Green Refractories Co., supra,* at 35).

For the foregoing reasons, the judgment of the Supreme Court, Suffolk County, is reversed insofar as appealed from, on the law, and a new trial is granted to the appellants, with costs to abide the event.

MANGANO, P. J., HARWOOD and BALLETTA, JJ., concur.

Ordered that the judgment is reversed insofar as appealed from, on the law, and a new trial is granted to the appellants, with costs to abide the event.