George H. CASE, Anna Case, Plaintiffs,

v.

PAUL TROESTER MASCHINEN-FABRIK, Troester Machinery, Ltd., Defendants.

No. 98–CV–6545L.

United States District Court, W.D. New York.

March 30, 2001.

James Foley, Palmyra, NY, for plaintiffs.

Jonathan B. Fellows, Bond, Schoeneck & King, Syracuse, NY, Arnd N. vonWaldow, Wayne William Ringeisen, Reed Smith Shaw & McClay, LLP, Pittsburgh, PA, for defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

On January 8, 1998, plaintiff George Case ("plaintiff" or "Case"), a sheeter operator at Garlock, Inc., suffered injuries when his right arm became entangled in a Model KD–IT–45/15 calender machine [1] that he was operating during the course of his employment. Troester Maschinenbau GmbH & Co. ("TMG"), a German partner-

---

1. A machine that prepares material used in the manufacture of gaskets.

ship, manufactured the machine in question in 1982. George Case and his wife, Anna Case (collectively "plaintiffs"), commenced the present action, against defendants Paul Troester Maschinenfabrik ("PTM"), another German partnership, and Troester Machinery, Ltd. ("TML"), an American corporation based in Ohio. Plaintiffs assert claims of breach of express and implied warranties of merchantability and fitness for a particular purpose, strict products liability for design defects and failure to warn, negligence stemming from a manufacturing defect, gross negligence, and, on behalf of Anna Case, loss of consortium. Presently before the Court is defendants' motion for summary judgment, and plaintiffs' cross-motion to amend the complaint and for additional discovery.

## FACTUAL BACKGROUND

A principal element of defendants' motion for summary judgment is their contention that neither of them manufactured the machine plaintiff was operating when he was injured. Instead, they contend that they had no relationship to TMG, the German entity that manufactured the machine. A brief review of the nature and history of these entities is, therefore, appropriate.

TMG was founded in 1969, and based in Sontra, Germany. Defendants maintain that TMG produced only manufacturing mills and calenders. In 1994, it terminated business operations, was dissolved and liquidated, and, according to defendants, ceased to exist as a legal entity under German law. Defendants further submit that at the same time, TMG's real estate and "nearly all" of its production machines were sold to third parties, but certain raw materials, two or three used machines and certain furniture were purchased by PTM. The proceeds from the liquidation of TMG's assets were utilized to satisfy its debts, and the remaining balance was distributed to TMG's partners.

PTM has been a partnership based in Hanover, Germany since 1892. Between 1969 and 1994, during TMG's existence, PTM manufactured only vulcanizing plants, rubber extruders, plastic extruders and complete production lines. Defendants maintain that there is no legal relationship between PTM and TMG, and PTM is not the successor-in-interest to TMG. They maintain that PTM is a "completely separate, unrelated and distinct company from TMG." Dkt. # 17, ¶ 13. At the same time, defendants concede that "some, but not all, of TMG's former partners, management and/or shareholders now serve as partners and/or in management of PTM." Id., ¶ 15. Defendants also concede that since 1994, PTM has produced two calender machines, but they consider them different in design and operation from those previously produced by TMG. PTM further asserts that it never assumed TMG's tort liabilities or any of its debts.

TML was established as an Ohio corporation in 1995 for the sole purpose of selling rubber and plastic extrusion machines in the United States. It has never manufactured any products. TML's management, personnel, assets and partners are all different from TMG.

Plaintiffs maintain that Troester is a trade name used by a partnership that has produced various machines for use in the manufacture of gaskets since 1892. They also assert that the machine involved in the accident was assembled pursuant to a cooperation agreement between TMG and PTM, and that "various kinds of calenders" were among the machines that TMG and PTM manufactured together. The manufacture of the machine in question was performed under the engineering, technical, and design direction of Hans Johzhim Golish, who was the technical director of both TMG and PTM and a PTM

employee for 23 years. Moreover, all partners of TMG were partners in PTM. *See* Dkt. # 24, Plaintiffs' Ex. 8.

Plaintiffs also assert that prior to 1970 the KD–IT–45/15 calender machine was produced at PTM's location in Hannover. During TMG's existence, the same model calender machine was produced by TMG in Sontra. Upon its dissolution in 1994, all of TMG's patents, design drawings, drafts, technical information, engineering plans, histories of modifications, customer lists and sales information were transferred to PTM. Finally, plaintiffs assert that since TMG's dissolution, PTM continues to service TMG's former customers.

## DISCUSSION

### I. Summary Judgment—General Standards

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, the burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and, in ruling on a motion for summary judgment, the Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *McKelvie v. Cooper*, 190 F.3d 58, 61 (2d Cir.1999).

To defeat summary judgment, the non-moving party must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only if the

record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On a motion for summary judgment, "a court's responsibility is to assess whether there are any factual issues to be tried." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991), *citing, Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### II. Successor Liability

In support of their motion for summary judgment, defendants' principal argument is that plaintiffs cannot establish that either PTM or TML are successors-in-interest to TMG, and no successor liability exists.

Under New York law[2], the general rule is that a corporation that acquires the assets of another corporation is not liable for the torts of its predecessor. *See Graham v. James*, 144 F.3d 229, 240 (2d Cir.1998); *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2d Cir.1996). However, there are established exceptions to the general rule, and a successor business entity may be held liable for the torts of its predecessor if (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchaser was a mere continuation of the seller, or (4) the transaction is entered into fraudulently to escape such obligations. *See Baker v. Dorfman*, 2000 WL 10102, *4 (S.D.N.Y. 2000), *aff'd in part, vacated in part on other grounds*, 232 F.3d 121 (2d Cir.2000).

**2.** The parties appear to agree in this diversity action that New York law controls with respect to the underlying product liability claims. On the issue of successor liability, defendants correctly maintain that New York law controls as well, a position which plaintiffs do not challenge.

The New York Court of Appeals has previously noted that "[t]he second and third items are based on the concept that a successor that effectively takes over a company in its entirety should carry its predecessor's liabilities as a concomitant to the benefits that it derives from the good will purchased. This is consistent with the desire to ensure that a source remains to pay for the victim's injuries." *Grant–Howard Assocs. v. General Housewares Corp.*, 63 N.Y.2d 291, 295, 482 N.Y.S.2d 225, 227, 472 N.E.2d 1 (2d Cir.1984).

■ The distinction in the present case, of course, is that partnerships, rather than corporations, are involved. Plaintiffs initially attempted to argue that this distinction renders any successor liability analysis inapplicable. I disagree. The Second Circuit has held that "[t]he traditional rule of corporate successor liability and the exceptions to the rule are generally applied regardless of whether the predecessor or successor organization was a corporation or some other form of business organization." *Graham v. James*, 144 F.3d at 240; *see also R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 93–CV–8571, 1997 WL 27059, *5 n. 3 (S.D.N.Y. Jan.23, 1997) ("[t]he fact that in this case the 'predecessor company' was a partnership and not a corporation does not preclude the application of the traditional successor liability doctrine"); *Soo Line R.R. Co. v. B.J. Carney & Co.*, 797 F.Supp. 1472, 1482 n. 4 (D.Minn.1992) (rejecting argument that partnership cannot be held liable under any theory of successor liability).

■ Plaintiffs rely heavily on their assertion that the machine was manufactured pursuant to a cooperation agreement between TMG and PTM (*see* Cooperation Agreement, Plaintiffs' Ex. 4 (Dkt.# 24)), and, as a result, PTM is a proper party. The agreement memorializes that PTM and TMG "are working together in the area of development and manufacture of machines for the processing of rubber materials and synthetics." *Id.*, p. 1. Among the machines specifically included in the agreement are "various kinds of calenders." On the issue of "third party liability," the agreement focuses on patent claims.[3] Although it appears clear that many of the provisions of the agreement inure to the benefit of PTM, the terms of the agreement are not so broad as to define PTM's liability in the present context.[4]

■ Plaintiffs' next contention is that PTM and TML are carrying on the gasket sheet calender business previously operated by TMG, and that, therefore, PTM and TML are a mere continuation of TMG. Under the mere continuation exception to the general rule, courts have examined various factors including whether the successor (1) retained the same employees, supervisory personnel, the same production facilities in the same location and the same business name, (2) continued production of the same products, (3) maintained the same assets and general business operations and (4) held itself out to the public as the continuation of the previous enter-

---

3. *See* Cooperation Agreement, Plaintiffs' Ex. 4, pp. 2–3 (Dkt.# 24). "In the event that use of the patent rights, or inventions and know-how should result in the prosecution of a third party claim against the partners of this agreement for patent violation or other legal claims, then the costs for the defense against the third party claims, as well as the payable compensation, shall be defrayed proportionally to the degree in which the partners have benefitted economically from the protected goods used by the third party."

4. Because I do not rely on the terms of the Cooperation Agreement for my determination of the instant motion, resolution of whether the machine was manufactured pursuant to a partnership or joint venture between TMG and PTM, and whether German law controls that issue, is unnecessary.

prise. *Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F.Supp. 182, 206 (E.D.N.Y.1997); *New York v. Panex Industries, Inc.*, 94–CV–400, 1996 WL 378172, *8 (W.D.N.Y. June 24, 1996); *see also Ladjevardian v. Laidlaw–Coggeshall, Inc.*, 431 F.Supp. 834, 839 (S.D.N.Y.1977) (holding that "mere continuation" exception applies when there is "something in the nature of a corporate reorganization, rather than a mere sale").

Here, certain of these factors are unquestionably satisfied. It is undisputed that TMG was created in 1969 by a group of partners who, at that time, were also partners of PTM. Transcript of Deposition of Peter Schmidt, Ex. 7 to Dkt. # 24, p. 9. Schmidt further testified that TMG was created to extend PTM's capacity. *Id.* When TMG was dissolved in 1994, PTM retained most of the managerial personnel and certain of the employees of TMG, at least for some period of time. In further support of their position, plaintiffs have submitted evidence that some of TMG's assets and customers have been transferred to PTM's partners. In addition, defendants concede that at least some of the former partners of TMG were or are partners in PTM. *See* Plaintiffs' list of identical managers of PTM and TMG in the year before TMG's liquidation, Plaintiffs' Ex. 5 (Dkt.# 24); *see also* List of PTM and TMG partners, Plaintiffs' Ex. 8 (Dkt.# 24). PTM's assertion that it did not design the machine at issue is undermined by the fact that, at the relevant time, PTM and TMG had an agreement in place, which gave PTM exclusive access to TMG's designs. *See* Cooperation Agreement, Plaintiffs' Ex. 4 (Dkt.# 24).

There is also at least a question of fact with respect to whether PTM continued production to some extent of TMG's products. The machine involved in the accident was a KD–IT–45/15, and it bore the Troester label. *See* Dkt. # 24, Ex. 1. PTM admits that it has manufactured calenders since TMG's dissolution. Notably, although TMG was dissolved some seven years ago, PTM has recently advertised its Troester KD–45/15 gasket sheet calender, virtually the same model number that had been used by TMG. Moreover, PTM's Hans–Johzhim Golisch testified: "I had the overall technical responsibility [for the Troester KD–IT–45/15]; that is to say, all-important matters were coordinated with me." Transcript of Deposition of Hans–Johzhim Golisch, Ex. 6 to Dkt. # 24, pp. 4–5.

There is a further question of fact with respect to whether PTM and TMG held themselves out to the public as the same business. Notwithstanding defendants' contention that PTM and TMG were entirely distinct entities, plaintiffs maintain that, prior to TMG's dissolution, both TMG and PTM were referenced in the same business brochures as simply Troester. In support, they have submitted a joint Troester advertisement referencing both PTM and TMG. *See* Plaintiffs' Ex. 17, Dkt. # 24. The phrases "*Our* plant in Hannover" (PTM's base) and "*Our* plant Sontra" (TMG's base) (emphasis added) could be construed to suggest joint business operations under the Troester name.[5] It is also established that PTM and TML, like TMG, have used the same trade name— Troester. The obvious similarity between the two entities' names suggests to the

---

**5.** Plaintiffs do not raise the point, but I note that even Garlock's purchase order for the machine that is the subject of this dispute identifies the seller as "Troester Maschinenbau Hannover–W. Germany." This is particularly interesting in light of the fact that defendants cite TMG's base as Sontra, Germany and PTM's base as Hannover, Germany, and rely on these two bases of operations to support their argument that the two entities were separate and distinct.

general public as well that there was some affiliation between them.

I find this evidence to be sufficient to defeat defendants' motion. *See Burgos v. Pulse Combustion, Inc.,* 227 A.D.2d 295, 295–96, 642 N.Y.S.2d 882 (1st Dep't 1996) (lower court correctly found issues of fact bearing on successor liability, based on evidence that defendant purchased almost all of predecessor's fixed assets and intangibles, that defendant assumed a name nearly identical to predecessor's, that at least one officer from predecessor was retained by defendant, and that same products were manufactured at plants transferred by predecessor to defendant); *Winch v. Yates American Mach. Co.,* 205 A.D.2d 1001, 1003, 613 N.Y.S.2d 980 (3d Dep't 1994) (record raised question of fact regarding whether defendant effectively took over predecessor in its entirety), *appeal dismissed,* 84 N.Y.2d 1027, 623 N.Y.S.2d 182, 647 N.E.2d 454 (1995); *Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. at 838 (in part, denying summary judgment because, *inter alia,* "on the present record it is not possible to determine whether or not Laidlaw–Coggeshall impliedly assumed liability for the debts of [its predecessor], and observing that "[s]uch a finding can only be made after the facts have been fully developed at trial" ").

■ Plaintiffs also assert that successor liability exists based upon the so-called product line exception to the general rule. This exception provides that "when a corporation buys substantially all of the assets of a corporate manufacturer and thereafter continues essentially the same manufacturing operation it may be strictly liable for defects in products in the same line even though they were in fact made by the predecessor." *LaFountain v. Webb Industries Corporation,* 951 F.2d 544, 547 (3d Cir.1991); *see also Roll v. Tracor, Inc.,* 26 F.Supp.2d 482, 488–489 (W.D.N.Y.1998). Defendants maintain that in order to in-

voke the product line exception, plaintiffs bear the burden of proving: (1) their remedy against the original manufacturer was virtually destroyed by the successor's acquisition of substantially all of predecessor's assets; (2) the successor entity continued to manufacture essentially the same product line as its predecessor; (3) the succeeding entity had the ability to assume the original manufacturer's risk-spreading role; and (4) the successor benefitted from the original manufacturer's good will. *Gavette v. The Warner & Swasey Co.,* 1999 WL 118438, *9 (N.D.N.Y.1999). Because there exist questions of fact regarding whether PTM was a mere continuation of TMG, I need not determine this issue.

■ Plaintiffs' attempt to impose liability on TML because it is a subsidiary of PTM is attenuated at best, and their theory of liability does not withstand scrutiny under the aforementioned principles. TML is a separate corporation with separate management based in a separate country. It does not manufacture any products; it merely sells them in the United States. Indeed, TML was not even incorporated until 1995, some thirteen years after the machine at issue was manufactured, and a year after TMG was dissolved. Moreover, TML has neither expressly nor impliedly agreed to assume TMG's debts, and TML was not a party to the cooperation agreement between PTM and TMG. Plaintiffs have failed to demonstrate any adequate connection between these two entities to survive the pending motion for summary judgment.

For all of these reasons, defendants' motion for summary judgment based upon successor liability grounds is denied with respect to PTM, but granted with respect to TML.

### III. The Failure to Warn Claim

■ Alternatively, defendants seek summary judgment on plaintiffs' claim that

defendants failed to warn the users of the machine in question of the risks associated with using it. Defendants respond that they had no duty to warn Case because he had actual knowledge of the danger involved in using the machine.

▮ Under New York law, a manufacturer of a product, which it "knows or should know is dangerous if used in the usual and expected manner," has a duty "to warn users of the product of the danger unless the danger is obvious or well known." *Billiar v. Minnesota Mining & Mfg. Co.*, 623 F.2d 240, 243 (2d Cir.1980) (citations omitted). However, there is no duty to warn, and, therefore, no liability for failure to warn, where the "user is fully aware of the nature of the product and its dangers." *Id.; Jiminez v. Dreis & Krump Mfg. Co.*, 736 F.2d 51, 55 (2d Cir. 1984). The "knowledgeable user" doctrine, as it is known, is a concept which relieves a manufacturer of liability on a failure to warn theory where a user knows or has reason to know of the dangerous propensities of the product independent of the information supplied to him by the manufacturer or distributor. *See Billiar*, 623 F.2d at 243; *Bellinger v. Deere & Co.*, 881 F.Supp. 813, 815 (N.D.N.Y.1995); *Billsborrow v. Dow Chem.*, 177 A.D.2d 7, 15 n. 1, 579 N.Y.S.2d 728, 733 n. 1 (2d Dep't 1992).

Case, through his own deposition testimony, has established himself as a knowledgeable user with respect to Troester calender machines. Plaintiff testified that, at the time of his accident, he had operated machines similar to the one which caused his injuries for approximately 18 years. Transcript of Deposition of George Case ("Case Dep."), Ex. D to Dkt. # 18, p. 4. He further acknowledged that he had been operating the specific machine involved in his accident for approximately three years prior to the accident. *Id.* at 7–8. Case considered that machine to be operationally and functionally identical to the other Troester machines that he operated in the course of his employment at Garlock. *Id.* at 13. He testified that he felt more comfortable operating the older Troester machines, like the one involved in his accident, than the two newer Troester machines owned by Garlock. *Id.* at 13–15. From approximately 1993 until the time of this accident, Case estimated that 90 percent of his work time involved operating Garlock's Troester machines. *Id.* at 16–17.

Case admits that in the late 1970's and or early 1980's he received training in the proper and safe operation and function of Troester calender machines that were substantially similar to the machine involved in his accident. *See* Plaintiffs' Response to Defendants' Statement of Facts, ¶ 36, Dkt. # 26. During his training period, Case testified that he never requested any written manuals, instructions, or other literature relating to the proper and safe operation of these machines, but that if he had perceived the need for such materials, he would have requested them. Case Dep. at 27–28. Plaintiff acknowledged that during his initial training on the machines, he was instructed specifically to keep his hands and tools away from the in-running nip point created by the hot and cold rollers of the Troester machines. *Id.* at 28. Case stated that doing otherwise could result in serious injury. *Id.* Plaintiff admitted that he knew that, because of the training he received, his prior work experience at Garlock, and his common sense, he had to keep away from and stay clear of that in-running nip point. *Id.* at 32. Plaintiff further candidly testified that he could think of no additional information about the operation and function of Troester machines, such as the machine involved in his accident, which he would have liked to have had at the time of his accident. *Id.* at 40.

In light of these admissions, there is no genuine issue of material fact as to whether plaintiff was a knowledgeable user of Troester's calender machines at the time of his accident. Indeed, plaintiffs admit the truth of many of these facts in their Statement of Uncontroverted Facts. Dkt. # 26, ¶¶ 30–43. *See also Bigness v. Powell Electronics, Inc.,* 209 A.D.2d 984, 985, 619 N.Y.S.2d 905, 906 (4th Dep't 1994) (affirming summary judgment, and holding that "there is no necessity to warn a customer already aware—through common knowledge or learning—of a specific hazard and, in the proper case, the court can decide as a matter of law that there is no duty to warn or that the duty has been discharged") (internal quotation marks and citations omitted); *see also Tripolone v. Genova Products, Inc.,* 95–CV–1018, 1997 WL 583120, *7 (N.D.N.Y. Sept.3, 1997) (finding plaintiff to be a knowledgeable user of product, which thereby absolved manufacturer of duty to warn).

Plaintiffs' post-argument submission of their expert's appendix to his report does not strip defendants of their knowledgeable user defense. The submission is comprised mainly of generic warnings and articles that have no relevance in this proceeding, and they cannot change the facts to which Case himself testified.

Defendants also contend that Case cannot establish that any alleged failure to warn is a proximate cause of the injuries sustained, in light of Case's experience with the machine and his inability to recall how the accident occurred. The Southern District's discussion of a similar issue is particularly instructive:

> It is clear that any duty Ford may have had to warn the owners of its tractors cannot be the basis of liability here. For [third party plaintiff] has testified, and the other parties do not dispute it, that he knew the practice of riding passengers on the tractor was dangerous. Warning [third party plaintiff] would not have increased his awareness of the danger. Ford's failure to warn him was not a proximate cause of [plaintiff's] injury.... Put another way, [third party plaintiff] falls within the so-called "knowledgeable user" exception, which relieves a manufacturer of his duty to warn where the user was in fact aware of the product's dangerous nature.
>
> The knowledgeable user exception involves a subjective test: whether the particular user was aware of the danger. Since there is uncontested and clear evidence that [third party plaintiff] knew of the danger, summary judgment is appropriate.

*Kerr v. Koemm,* 557 F.Supp. 283, 286–287 (S.D.N.Y. Feb.8, 1983) (citations omitted); *see also Torrogrossa v. Towmotor Co.,* 44 N.Y.2d 709, 405 N.Y.S.2d 448, 449, 376 N.E.2d 920 (1978) (failure to warn is not proximate cause where the warning would not have prevented the accident).

For these reasons, defendants' summary judgment motion is granted with respect to plaintiffs' claims pertaining to any alleged failure to warn, and such claims are hereby dismissed.

## IV. The Manufacturing Defect Claim

At oral argument, plaintiffs voluntarily withdrew their manufacturing defect claim. *See also* Plaintiffs' Response to Defendants' Interrogatory # 5 ("Plaintiff does not contend that the machine was improperly and or defectively manufactured or assembled by Troester ...."). Any manufacturing defect claim is, therefore, dismissed.

## V. Plaintiffs' Cross–Motion to Amend and for Discovery

▆ Plaintiffs cross-move to amend their summons and complaint to name TMG's individual partners.[6] The decision

6. In subsequent papers, plaintiffs recharacter-   ized their motion as "more properly a request

to grant or deny a motion to amend is within the sound discretion of the district court. *Krumme v. WestPoint Stevens, Inc.,* 143 F.3d 71, 88 (2d Cir.1998). As a preliminary matter, I note that the parties themselves proposed that all amendments to the pleadings as well as the joinder of all parties were to be completed by November 1, 1998. (Dkt.# 7). The Court thereupon granted the parties' request and ordered that "[a]ny application to join any person as a party to this action shall be made on or before November 1, 1998," and further ordered that "[a]ny application to amend any pleading in this action shall be made on or before November 1, 1998." Dkt. # 9. That scheduling order also provided that "[t]he deadlines set in this scheduling order are firm and will not be extended, even by stipulation of the parties, absent good cause." *Id.* No request to extend the dates contained within that portion of the scheduling order was made.

Presumably, as an explanation for their inordinate delay in seeking this relief until this late juncture, plaintiffs suggest that it did not become clear that PTM was a partnership rather than a corporation until defendants filed their motion for summary judgment. *See* Foley Aff., ¶ 9, Dkt. # 25; Plaintiffs' Reply Memorandum, p. 3, Dkt. # 32. I disagree. Although it is true that PTM identified itself as a corporation in its answer (Dkt.# 5), there is ample evidence that this mistake was cleared up relatively early and plaintiffs were aware well before the filing of the instant summary judgment motion that PTM was a partnership. For example, plaintiffs themselves identified PTM as a "limited partnership" in their own complaint (Dkt.# 1, ¶ 2). In addition, defendants referred to PTM's partners both in their responses to plaintiffs' interrogatories in February 1999 (Response to Interrogatory 3, Dkt. # 30) and in depositions taken by plaintiffs in the summer of 1999. It further appears that at least one deposition exhibit listed PTM's partners. Plaintiffs' Ex. 8, Dkt. # 24.

In any event, plaintiffs suggest that an "alternative would be to commence a new action against the partners of TMG." Plaintiffs' Reply Memorandum, p. 3, Dkt. # 32. At argument, plaintiffs acknowledged that they have in fact commenced a separate action against Karl Schmidt, as a former partner of TMG (*Case v. Schmidt,* 00–CV–6476), and that they did not feel the need to pursue any of the other former partners. Given plaintiffs' concession at argument that their second lawsuit essentially resolves any issues pertaining to their cross-motion to amend or for joinder, plaintiffs' cross-motion is denied.

Plaintiffs also seek to reopen discovery to determine the addresses of TMG's partners. For many of the same reasons identified above, and for the additional reasons that fact discovery closed in February 2000 (Dkt.# 13), plaintiffs' cross-motion for this discovery is denied. Plaintiffs' cross-motion to reopen discovery to obtain additional information pertaining to TML is denied as moot.

## CONCLUSION

To the extent plaintiffs have asserted any claims based upon a manufacturing defect or a failure to warn, defendants' motion for summary judgment (Dkt.# 15) is in all respects granted, and all such claims are dismissed with prejudice. Defendants' motion for summary judgment is also granted with respect to defendant Troester Machinery, Ltd., and the complaint is dismissed against that defendant with prejudice. In all other respects, de-

for relief pursuant to Rule 19(a) ..." (Dkt.# 32), but they offer no legal authority

for such joinder.

fendants' motion for summary judgment is denied.

Plaintiffs' cross-motion to amend the summons and complaint and for additional discovery (Dkt.# 22) is in all respects denied.

IT IS SO ORDERED.